UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TED GIPSON,

                        Petitioner,              Case No. 2:11-cv-14822
                                                     Hon. Denise Page Hood

v.

KENNETH ROMANOWSKI,

                        Respondent.

_____/

**OPINION AND ORDER (1) DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND , (2) DENYING CERTIFICATE OF APPEALABILITY, AND (3) GRANTING PERMISSION TO APPEAL IN FORMA PAUPERIS**

This is a habeas case brought by a Michigan prisoner under 28 U.S.C. § 2254. Ted Gipson, ("Petitioner"), was convicted after a jury trial in the Macomb Circuit Court of first-degree felony murder, MICH. COMP. LAWS § 750.316, and armed robbery, MICH. COMP. LAWS § 750.529, for actions taken with his brother, Scott Gipson, in the beating death of David Witting. Petitioner was sentenced to life imprisonment for the murder conviction and 285 to 480 months for the robbery conviction.

The amended petition asserts six grounds for relief: (1) Petitioner was denied his right to a fair trial by admission of evidence of his "Murder 1" tattoo, (2) Petitioner's Fifth Amendment rights were violated by admission of his

coerced statement to police, (3) Petitioner's Sixth Amendment right to counsel was violated when the prosecutor used jail-house informants to elicit incriminating statements from him, (4) Petitioner was denied his Sixth Amendment right to the effective assistance of appellate counsel, (5) the prosecutor committed misconduct by offering perjured testimony from the jail-house informants, and (6) the Michigan Court of Appeals erroneously dismissed Petitioner's application for leave to appeal following his state post-conviction proceeding.

The Court finds that Petitioner's claims are without merit. Therefore, the petition will be denied. The Court will also deny Petitioner a certificate of appealability, but it will grant him permission to appeal in forma pauperis.

## I. Background

The Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

> Defendant's convictions arise from the beating death of defendant's drug supplier, David Witting, during a robbery. Evidence at trial indicated that defendant arranged a meeting with Witting to purchase drugs. During the transaction, defendant's brother, Scott Gipson, emerged from behind a dumpster and struck the victim on the head with a bottle. Defendant and Gipson thereafter punched and kicked the victim, who died from internal bleeding after his spleen ruptured. There is no dispute that

defendant was present during the assault, and defendant admitted kicking or punching the victim once or twice, but defendant generally maintained that he did not know that Gipson was going to attack the victim, and defendant claimed that he only struck the victim when he believed the victim was going to hit him.

*People v. Gipson*, No. 287324, 787 N.W.2d 126, *1 (Mich. App. Jan. 28, 2010).

Following his conviction and sentence, Petitioner filed a claim of appeal in the Michigan Court of Appeals. His appellate brief raised what now form his first two habeas claims. The Michigan Court of Appeals affirmed Petitioner's convictions in a published opinion. *Id.*

Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court, raising the same two claims he raised in the Michigan Court of Appeals. The Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed. *People v. Gipson*, 784 N.W.2d 213 (Mich. July 26, 2010) (table).

Petitioner then filed the instant action along with a motion to stay the case so that he could present additional claims to the state courts in a post-conviction review proceeding. The Court granted the motion.

Petitioner then filed a motion for relief from judgment in the state trial court. The motion raised what now form Petitioner's third, fourth, and fifth

habeas claims. On September 11, 2013, the trial court issued an opinion and order denying the motion. See Dkt. 20-3.

Pursuant to Michigan Court Rule 7.205(G)(3), Petitioner had six months to file a delayed application for leave to appeal in the Michigan Court of Appeals. On March 12, 2014, the last day to file an appeal, Petitioner attempted to file a delayed application for leave to appeal. On March 24, 2014, the Michigan Court of Appeals' Clerk notified Petitioner that his application was defective because he did not provide a proof of service upon the prosecutor. On June 3, 2014, the appeal was dismissed for failure to pursue the case in conformity with the court rules. *People v. Gipson*, No. 320828 (Mich. Ct. App. June 3, 2014). Petitioner's motion for reconsideration was denied on July 21, 2014.

On September 2, 2014, Petitioner attempted to file a second application for leave to appeal in the Michigan Court of Appeals. The court summarily dismissed the appeal "because appellant failed to file the application within the 6-month time period required by MCR 7.205(G)(3)." *People v. Gipson*, No. 323449 (Mich. Ct. App. Oct. 20, 2014).

In the meantime, Petitioner had filed an application for leave to appeal in the Michigan Supreme Court from his first dismissed appeal to the Michigan

Court of Appeals. On April 28, 2015, the Michigan Supreme Court issued an order denying leave to appeal because the court was not persuaded that the questions presented should be reviewed. *People v. Gipson*, 861 N.W.2d 902 (Mich. 2015) (table).

Petitioner then returned to this Court and filed a motion to reinstate his federal habeas case and an amended petition. The Court granted the motion, and Respondent subsequently filed a responsive pleading and the relevant portions of the state court record. The matter is now ready for decision.

## II. Standard of Review

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003), quoting

*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) quoting *Williams*, 529 U.S. at 413.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103 (internal quotation omitted).

## III. Analysis

### A. Procedural Default and Statute of Limitations

As an initial matter, Respondent asserts that several of Petitioner's claims are barred by his state court procedural default and by application of the one-year statute of limitations. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if a state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment, absent a showing of cause and prejudice to excuse the default. See *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).

A state court procedural default, however, is not a jurisdictional bar to a review of a habeas petition on the merits. See *Trest v. Cain*, 522 U.S. 87, 89 (1997). That is, "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F. 3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). It may be more economical for the habeas court to simply review the merits of the petitioner's claims, "for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*,

520 U.S. at 525. Similarly, where the statute of limitations poses complicated issues, it may be more efficient for the Court to resolve the merits of the petition against the Petitioner. See, e.g., *Johnson v. Mackie*, 2014 U.S. Dist. LEXIS 50896, *7, 2014 WL 1418678 (E.D. Mich. April 14, 2014).

In the present case, the Court deems it more efficient to proceed directly to the merits of Petitioner's substantive claims, especially because Petitioner alleges that his appellate counsel was ineffective for failing to preserve the defaulted claims (habeas claim 4), and because Petitioner contends that the prison or state appellate court mishandled his appellate filings on state post-conviction review causing his default (habeas claim 6). Accordingly, the Court will bypass discussion of Respondent's procedural arguments, (and the Court therefore also need not discuss Petitioner's fourth and sixth claims which seek to undermine those defenses), as it is more efficient to resolve Petitioner's substantive claims on the merits against him.

B. Admission of Tattoo Evidence

Petitioner first asserts that his trial was rendered fundamentally unfair by the admission of evidence that he bore a tattoo stating "Murder One." This claim was presented to and rejected by the Michigan Court of Appeals on the merits during Petitioner's direct appeal.

"Errors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2006). Typically, to show a due-process violation under AEDPA rooted in an evidentiary ruling, there must be a Supreme Court case establishing a due-process right with regard to that specific kind of evidence. *Collier v. Lafler*, 419 F. App'x 555, 558 (6th Cir. 2011).

The Michigan Court of Appeals denied relief with respect to Petitioner's evidentiary claim on the following basis:

> Defendant argues first that the trial court erred in admitting evidence that, after the charged offenses, he obtained a tattoo that read "Murder 1" and depicted a chalk outline of a dead body underneath. Defendant argues that this evidence was irrelevant and unfairly prejudicial. We review the trial court's decision to admit this evidence for an abuse of discretion, which exists when the trial court's decision falls outside the range of principled outcomes. *People v. Blackston*, 481 Mich. 451, 460 (2008). Generally, "the trialcourt's decision on a close evidentiary question . . . ordinarily cannot be an abuse of discretion." *People v. Sabin*, 463 Mich. 43, 67 (2000).
>
> Generally, all relevant evidence is admissible. MRE 402; *People v. Yost*, 278 Mich. App. 341, 355 (2008). Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence. MRE 401; *Yost*, supra at 355. Even if relevant, evidence may be excluded if its probative

value is substantially outweighed by the danger of unfair prejudice. MRE 403; *Yost*, supra at 407. "Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *Blackston*, supra at 462. The determination whether evidence should be excluded pursuant to MRE 403 is best left to the trial court's contemporaneous assessment. *Id.*

Defendant asserts that there are many possible reasons for the tattoo. Indeed, defendant was able to present to the jury a number of plausible theories as to why he obtained the tattoo. Those theories included referring to his dog, which was shot during the police raid on his house; and as a reminder of something he overcame in his life, because he believed he would win the case and not even be charged with the instant offenses. However, there was also evidence that defendant altered the tattoo from an outline of a body to the shape of a dog after being informed that the police wanted to photograph the tattoo. Furthermore, other possible reasons are, as argued by the prosecution, bravado or a symbolic representation of defendant's acknowledged connection to the victim's death. Under the circumstances, the tattoo was relevant to the issues of defendant's intent and culpability in the victim's death. Because the prosecution presented significant other evidence of defendant's guilt without unduly focusing on the tattoo evidence, and because defendant had the opportunity to present his own explanation of the tattoo, we do not believe that the probative value of the tattoo was substantially outweighed by any danger of unfair prejudice. At the most, it would be a close question of the kind that we could not deem an abuse of discretion.

*Gipson*, 787 N.W.2d 126, *1-2.

This decision did not involve an unreasonable application of clearly

established Supreme Court law. First, Petitioner has failed to cite to, and this

Court is unaware of, any Supreme Court case holding that the admission of potentially prejudicial tattoo evidence can render a trial fundamentally unfair in violation due process. In the absence of a Supreme Court case "establishing a due-process right with regard to that specific kind of evidence," Petitioner cannot established entitlement to relief under section 2254(d). *Collier*, 419 F. App'x at 558.

Petitioner asserts that there are also innocent explanations for the tattoo. He was allowed to present those alternate explanations at trial during his own testimony, preserving the fundamental fairness of his trial. This claim is without merit.

## C. Admission of Petitioner's Statement to Police

Petitioner next asserts that his statement to police was admitted at trial in violation of his Fifth Amendment right against compelled self-incrimination because it was the product of police coercion. This claim was also rejected by the Michigan Court of Appeals during Petitioner's direct appeal.

The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions. *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). A confession is considered involuntary if: (1) the police extorted the confession by means of coercive activity; (2) the coercion in

question was sufficient to overbear the will of the accused; and (3) the will of the accused was in fact overborne "because of the coercive police activity in question." *McCall v. Dutton*, 863 F. 2d 454, 459 (6th Cir. 1988).

In determining whether a confession is voluntary, the ultimate question is "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). Without coercive police activity, however, a confession should not be deemed involuntary. *Connelly*, 479 U.S. at 167 ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause").

The Michigan Court of Appeals did not unreasonably apply this clearly established when it rejected Petitioner's claim on the merits as follows:

> Defendant next argues that statements that he made while in police custody should have been suppressed because they were not voluntarily made. Defendant argues that the statements were given while he was under the influence of drugs and were coerced by the police.
>
> Statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waived his or her Fifth Amendment rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *People v. Daoud*, 462 Mich. 621, 633 (2000). We review de novo a trial court's determination that a waiver was knowing, intelligent, and

voluntary. *People v. Tierney*, 266 Mich. App. 687, 707-708 (2005). When reviewing a trial court's determination of voluntariness, we examine the entire record and make an independent determination. *People v. Shipley*, 256 Mich. App. 367, 372 (2003). But we review a trial court's factual findings for clear error and will affirm the trial court's findings unless left with a definite and firm conviction that a mistake was made. *People v. Sexton*, 461 Mich. 746, 752 (2000). Deference is given to a trial court's assessment of the weight of the evidence and the credibility of the witnesses. *Id*.

"[W]hether a waiver of *Miranda* rights is voluntary depends on the absence of police coercion." *Daoud*, supra at 635. A waiver is voluntary if it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Shipley*, supra at 373-374.The voluntariness of a defendant's statements is determined by examining the totality of the circumstances surrounding the interrogation. *Daoud*, supra at 633-634. A court should consider factors such as: the duration of the defendant's detention and questioning; the age, education, intelligence, and experience of the defendant; whether there was unnecessary delay of the arraignment; the defendant's mental and physical state; whether the defendant was threatened or abused; and any promises of leniency. *Shipley*, supra at 373-374.

"[W]hether a waiver was made knowingly and intelligently requires an inquiry into defendant's level of understanding, irrespective of police conduct. *Daoud*, supra at 636. A defendant does not need to understand the consequences and ramifications of waiving his or her rights. A very basic understanding of those rights is all that is necessary. *Id*. at 642. Intoxication from alcohol or other substances can affect the validity of a waiver, but is not dispositive. *People v. Leighty*, 161 Mich. App. 565, 571 (1987).

Defendant argued below that his statements were coerced because the police threatened his mother. He testified at the *Walker* hearing that the police told him that his mother, who had been taken into custody, was being detained naked because her

clothes were confiscated for evidence. They also allegedly told him that if he spoke, she would be released. Otherwise, she would be charged with being an accessory to murder. Defendant further testified that during the 24 hours before he was taken into custody, he drank four to five 40-ounce beers, ingested approximately 25 Vicodin pills, and smoked 12 marijuana joints. Conversely, the detectives denied making the alleged statements regarding defendant's mother. They also testified that based on their experience, defendant did not appear to be under the influence of alcohol or drugs, and they had no trouble communicating with defendant. Defendant does not dispute that at the time his statements were given, he was in his mid-20s, had a GED, had some limited prior contact with the police, was interviewed within a short time after being taken into custody, and that his interviews, which were about three hours apart, lasted approximately an hour each. Defendant's suppression motion depended on the trial court's resolution of the parties' conflicting accounts of the circumstances surrounding defendant's interrogations, specifically whether the police threatened defendant's mother and whether defendant was under the influence of drugs when he gave his statements. In this regard, the trial court found that Detectives Keith Keitz and Kevin Woods, who both denied making the alleged statements regarding defendant's mother, and who both stated that defendant did not appear to be under the influence of alcohol or drugs, were credible. Further, as the trial court observed, defendant's admitted ability to lie regarding the amount of sleep he had and regarding his initial account of his role in the offense, as well as his ability to change his story to account for inconsistencies between his and Scott Gipson's account while minimizing his own involvement, belied defendant's assertion that he was "in a fog" because of his intoxication. Considering the totality of the circumstances and giving deference to the trial court's assessment of credibility, the trial court did not err by determining that defendant's statements were made voluntarily, knowingly, and intelligently. Thus, the trial court properly denied defendant's motion to suppress.

*Gipson*, 787 N.W.2d 126, *2-4.

As noted by the state appellate court, the resolution of Petitioner's coerced-confession claim essentially boiled down to a determination of whether Petitioner's account of the circumstances surrounding his questioning or the officers' contrary account was true. After hearing and observing the witnesses' testimony, the trial court chose to believe the officers' accounts.

Subsidiary factual questions in determining the voluntariness of a statement to police, such as whether the police engaged in the intimidation tactics alleged by a habeas petitioner, are entitled to the presumption of correctness accorded to state-court findings of fact. *Miller*, 474 U.S. at 112; § 2254(e)(1). On federal habeas review, a federal court must presume that the state court's factual findings were correct, unless the petitioner shows otherwise by clear and convincing evidence. *Williams v. Jones*, 117 F. App'x 406, 412 (6th Cir. 2004). Here, Petitioner does not offer clear and convincing evidence to overcome the presumption of correctness attaching to the trial court's credibility determination. Accepting the officers' version of the questioning as true, Petitioner has failed to demonstrate that his statement to police was the product of police coercion. The claim is therefore without merit.

D. Housing Petitioner with Known Police Informant

Petitioner next asserts that his Sixth Amendment right to counsel was

violated when the prosecution placed jail-house informants in his housing unit to elicit inculpatory statements, thereby violating his Sixth Amendment right to counsel.

This claim was raised by Petitioner in his motion for relief from judgment, but the trial court failed to address it in its opinion denying the motion. The state appellate courts subsequently dismissed Petitioner's appeal for failing to timely correct his filing deficiencies. Nevertheless, there is a presumption that a state court reached and rejected the merits of a claim when there is no statement in the state court order indicating that the adjudication was on a basis other than the merits. See *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1606 (2016) (per curiam) ("Containing no statement to the contrary, the Supreme Court of California's summary denial of Hinojosa's petition was therefore on the merits."). Accordingly, despite the lack of an explicit merits determination by the state trial court, Petitioner is required to show that the implicit merits denial of this claim ran contrary to, or involved an unreasonable application of, clearly established Supreme Court law under section 2254(d).

Under established Supreme Court law, a criminal defendant does not establish a Sixth Amendment violation "simply by showing that an informant,

either through prior arrangement or voluntarily, reported his incriminating statements to the [government]. Rather, the defendant must demonstrate that the [government] and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986). "[T]he Sixth Amendment is not violated whenever–by luck or happenstance–the State obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton*, 474 U.S. 159, 176 (1985). The Supreme Court has found that "[w]hen a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990).

Petitioner supports his claim with the purported affidavit of Chris Holman. Holman states in the affidavit that police contacted him about Petitioner's case and gave him the entire police file to review so that he could fabricate his testimony. See Dkt. 17, Exhibit B, Affidavit of Chris Holman. Holman states that the police also placed him with another inmate, Daryl Whittie, so that the two could corroborate each other's testimony that Petitioner made incriminating statements. Id. Holman states that Petitioner never in fact confessed to him, and that his trial testimony about statements

made by Petitoner was false. Id., ¶ 14.

At trial, Holman testified that he was housed in the same unit in jail with Petitioner. Dkt. 10-7, at 95-96. He testified that no one from the prosecution contacted him, and that he was the one who initiated communication after Petitioner made incriminating statements. Id., at 96. Petitioner described the circumstances surrounding the crime, and he admitted to kicking the victim. Holman testified to the promises made to him in exchange for his testimony. Id.,at 99-101. On cross-examination, defense counsel admitted the letter Holman wrote to the prosecutor initiating communication regarding Petitioner. Id., at 109. The letter was written in December of 2007. Id., at 124-25.

Daryl Whittie testified that he also wrote a letter to the prosecutor about Petitioner's incriminating statements made in December of 2007. Id., at 129. According to Whittie, Petitioner made "hundreds" of statements about the crime. Id., at 131-33. Whittie was contacted by the police after he wrote the letter. Id., at 134. Whittie also testified that he was the inmate who tattooed Petitioner with "Murder 1," and then helped cover the tattoo after Petitioner realized that it might be used against him. Id., at 134-35.

Neither the trial record nor Holman's dubious affidavit support Petitioner's claim. At trial, both jail-house informants testified that they

contacted the prosecution or police after Petitioner made incriminating statements. Therefore based on the trial record, the two men were not agents of the prosecution, and Petitioner's Sixth Amendment rights were not implicated by statements he made to them.

Holman's affidavit does not save the claim. In it, Holman states that Petitioner did not make any incriminating statements, and that Holman fabricated his testimony. If that is what happened, Petitioner's Sixth Amendment rights were not implicated because Petitioner did not make any incriminating statements. Instead, the issue would be the presentation of Holman's fabricated testimony discussed below.

In any event, there are very good reasons to doubt the statements in Holman's affidavit. At trial, defense counsel offered as an exhibit the initiating letter Holman wrote to the prosecutor. Dkt. 10-7, at 109. Holman's affidavit contains a detailed account of his contacts with the police, but it completely fails to mention the initiating letter he wrote. If the prosecution had Holman write them a fraudulent letter to make it appear that he was the one who initiated contact, one would expect that important and damning fact to be included in his affidavit. The failure to mention the letter created a reasonable basis for a reviewing court to find the contents of the affidavit to be false.

Accordingly, the rejection of Petitioner's claim was not unreasonable. First, the claim is belied by the trial testimony of Holman and Whittie, neither of whom testified that they elicited statements from Petitioner as agents of the prosecution. In fact, Holman's affidavit claims that Petitioner never made any incriminating statements to him. Finally, the affidavit does not account for Holman's letter to the prosecutor admitted at trial, undermining its veracity. Petitioner has therefore failed to demonstrate that the rejection of this claim was contrary to, or involved an unreasonable application of, clearly established Supreme Court law.

## E. Admission of Perjured Testimony

Petitioner's next claim also concerns Holman and Whittie, and it asserts that the prosecutor committed misconduct by knowingly offering their false testimony at trial. This claim was also presented to the trial court in Petitioner's motion for relief from judgment. Unlike the previous claim, the trial court examined this claim in detail, recounting and parsing the relevant trial testimony, and deciding that the new information in Holman's affidavit would not have made a different result at trial probable. The trial court also found that the affidavit was not sufficiently credible to warrant a new trial:

> Defendant submits that the fact that the two witnesses perjured themselves was "open, obvious and substantial and

would have been out-come-determinative [sic] if raised on appeal". However, he has not explained how this fact could have been known at the time of appeal, because the knowledge of the alleged misdeed was not unearthed until he was in possession of an affidavit attested to by one of the witnesses, Christopher Holman, in 2012. In this affidavit, Mr. Holman has recanted his testimony and set forth the scheme about which defendant complains. In this regard, defendant cannot justifiably make a claim of ineffective assistance of appellate counsel.

Defendant further asserts that the affidavit constitutes newly discovered evidence. Granting a new trial on the basis of newly discovered evidence requires a defendant to show that (2) the evidence itself, not merely its materiality, is newly discovered, (2) the newly discovered evidence is not cumulative, (3) using reasonable diligence, the party could not have discovered and produced the evidence at trial, and (4) the new evidence makes a different result probable on retrial. *People v. Grissom*, 492 Mich. 296, 320 (2012).

The Court finds that while the subject affidavit, taken at face value, satisfies the first three prongs necessary, it does not satisfy the fourth prong for several reasons. Defendant asserts that if he were granted a new trial, and if the subject witnesses were precluded from testifying, a different outcome would result, and he would be acquitted. The Court respectfully disagrees. After reviewing the transcripts of witness testimony given at trial, and defendant's own testimony at trial, it is clear that there is not much difference in the testimony, such that a jury could reach a verdict of innocence. For example, when inquired as to what defendant had told Christopher Holman, he responded,

> "He called, he called his buddy up to cop some pills, some Vicodins. His buddy was supposed to meet him. He went to meet him. His buddy didn't know his brother Scott was there and he went around the back, held out his hand. His buddy was pouring some pills into his hand. Scott, his brother, hit him in the back of

the head with a beer bottle. The guy hit the ground. They continued, they continued to put the boots to him, kick him, continued to do this over a matter of minutes, reached in his pocket, took his wallet, took the Vicodins and left." T June 11, 2008, pp 98-99.

"One time he, he made the comment that he took the guy's wallet and he took a couple hundred dollars out and threw the wallet into the sewer in front of his house. He's saying that's when the police found it, but then I heard him also say, there was a couple hundred dollars, I took the wallet and I threw the wallet. That was the only time that money was ever discussed." T June 11, 2008 p 102.

"He went there for the pills. He didn't have any money." Id.

"I was told it was a 22-ounce bottle of beer. That's what I was told, he was hit in the back of the head with it." Id, pp 102-103.

Witness Daryl Whittie testified in relevant part as follows:

"Well, he said him and his brother, you know, planned on, they called up this dude and they planned on robbing him or whatever and his brother waited for him behind a building with a beer bottle and he was counting out Vicodins so he didn't see him, because he was busy and he bashed him in the head with it. I guess they, you know, kicked him and punched him and all that stuff." T June 11, 2008 p 131.

"Well, he said they took some Vicodins and a wallet. At first he told me he took $200 out of his, out of the guy's wallet or something. As a matter of fact, the first time he said that the guy owed him $200 for something, because he ripped him off or something

like that. But then it kind of changed up. He said they took the wallet and threw it down in the sewer or something." Id. pp 132-133.

Compare defendant's trial testimony with the subject witnesses, and while there are some discrepancies, the general context and sequence of events are in accord:

"Well, I had called Dave up and I was going to buy Vicodins. I had $20.00 to buy Vicodins. He said - he came to my house. I gave him the money and he said he would be back in an hour and he never showed back up to my house." T June 16, 2008, p 11.

[The Vicodins were for his brother's girl and she had given defendant the $20 to buy them. When Dave never returned with the Vicodins, defendant began calling him but got no response. Three days later, defendant finally contacted him.]

"I said, man, are you crazy, my brother want to beat you up, man, you've got to get these pills and you've got to get this money back to him and he said I'm going to do that. All right, so that's how it slatted. So then I called him back later and that's when he actually answered his phone for once and he said yeah, meet me up at Joe's General, I got the Vicodins and the money for you now because it was three days because he decided to go on a crack binge for three days and he finally got his prescription so he had money now. So he was going to make everything right. I was going to make everything right." Id. p 12.

[Defendant testified he and his brother had no set plan when they went to meet the victim.]

"No, Actually he [brother Scott] wasn't supposed to go and the reason that he went is because, see, the

thing is my brother wanted to beat him up, okay, and I figured if he could get the money and pills back, and I talked to my brother, and he said that's fine then there would be no problems, okay. So I called Dave and made the set up and I was going to get them and he said I'm coming to make sure you get them." Id. p 13.

[Defendant testified that he had no intention to go and either beat up or rob the victim, nor did he tell the police or anybody else that he intended to steal something from him. Id. p 14.]

[After defendant and the victim met up, and the victim was in the act of giving defendant the drugs,]

"My brother came out and smashed him in the head with a beer bottle." Id. p 15.

"Well, actually when he struck him in the head with the beer bottle he came from behind and I was on the side like this and here's Dave. So when he struck him on the head Dave looked at me all crazy and that's when I struck him" Id. p 15-16.

[Defendant testified the reason he struck the victim was because he thought the victim was going to strike him.]

"After I punched him my brother grabbed him and threw him on the ground." Id p 16.

"After my brother threw him on the ground I kicked him once in the leg, in the thigh area." Id.

[After defendant's brother had kicked the victim several times while defendant testified he stood by and watched, he finally stopped.]

"He [brother Scott] told me - he looked at me kind of crazy and told me grab the wallet, grab the wallet." Id. p 18. "I grabbed the wallet because I was only listening to him, you know, he's my bigger brother. He's - he's bigger than me, stronger than me, and I was scared of him. After I saw what he just did to this guy I- I was worried." Id.

[Prior to his brother hitting the victim,]

"That's what he [victim] was doing. He was making a deal - making the deal right. The deal was I'm going to pay you back, I don't want no problems. I'm going to give you the money and I'm going to give you the pills for a bonus. So he was doing that. I don't know why my brother hit him in the head with the beer bottle. I didn't even know he was going to hit him in the head with a beer bottle. He was drinking a beer. He had no weapon. He told me he wasn't going to hurt him as long as I got the pills and the money back. I was just trying to be the peacemaker in between." Id. p 23.

[After defendant was arrested and he was in the MCJ, he met both Whittie and Holman. Holman and Whittie were cell mates. Defendant denied that he boasted about any of the details that led him to jail but did testify,]

"No, and I guess you could say that I was a big mouth when I always said that I didn't know my brother was going to hit him in the head with the bottle. It was a stupid mistake. He told me to grab the wallet and I grabbed the wallet. That's what I said I did. I didn't know any of this was going to happen. This was supposed to be a regular set up, that's all I ever told him. I never would say that - boost [sic] about anything I didn't do." Id. p 33.

[Defendant testified that he took the only money in the wallet - $40, and the witnesses' statements that there was $200 could have come from newspaper accounts; he did not know.]

The major discrepancy between defendant and Whittie's testimony concerns whose idea it was that defendant get a tattoo, crafted by Whittie, in the jail. Defendant claims it was Whittie's idea; Whittie claims defendant came to him and asked him to give him one. This discrepancy does nothing more than create a credibility issue for the jury, as the fact remains they both testified that Whittie did indeed give defendant a tattoo with a staple attached to a pencil, dipped in crafted ink.

Significantly defendant testified that he did discuss the crimes he was alleged to have committed with his jail mates. As earlier stated, the details of each testimony may have not all matched up, but the general gist of the overall criminal action painted the same picture. This is to be expected, as each individual remembered and related conversations as he perceived them. Therefore, the Court is convinced that the testimony given by Whittie and Holman was based on conversations had among the cellmates.

Now, Christopher Holman purportedly has recanted the testimony he gave. His affidavit states that the information gleaned came from police officers and defendant's case file. He attested at paragraph 14:

"At no time did Ted Gipson confess any crimes to me. All information I testified to was information I received from reading the case file of Ted Gipson provided to me by Det. Woods and Daryl's sister, the female officer." Further, at paragraph 15, it is stated, "My entire testimony in this case was false, fabricated by the Warren Police Detectives, done out of fear of them following through with the threats they made."

> [The affidavit did not state what type of threats were allegedly made.]

> The issue before the Court now, of course, is was Christopher Holman lying at trial or is he lying now?

> Where newly discovered evidence takes the form of recantation testimony, it's traditionally regarded as suspect and untrustworthy. *People v. Barbara*, 400 Mich. 352 (1977). Consequently, Michigan courts have expressed reluctance to grant new trials on the basis of recanting testimony. *People v. Cante*, 197 Mich. App. 550 (1992). Where neither the veracity nor the falsity of a recanting witness's testimony has been clearly established and where prior statements of that witness both support and contradict the new recanting testimony, it is not error for the trial court to deny a motion for new trial. *Id.* It is relevant whether the recanting witness comprised the sole complaining witness at trial, and where other witnesses testifying against the defendant are supported in their testimony by corroborating evidence and expert testimony, this supports a refusal to admit the recanting testimony. *Id.* In the instant case, there was corroborating testimony - specifically, defendant's testimony itself. Additionally, where facts pertaining to the credibility of the recanting witness were before the jury at trial, this militates against the unlikelihood that the witness's testimony was afforded undue significance, having caused the jury to closely scrutinize that witness and testimony. Id. Here, the witnesses' credibility was tested at great length in examination.

> Whether to grant a new trial on the basis of recantation testimony is a decision committed to trial court's discretion. *Id.*

> For the reasons as stated above, the Court is not persuaded that defendant has satisfied the requirements of MCR 6.508 such that he is entitled to the relief requested; accordingly, defendant's motion for relief from judgment is DENIED.

Dkt. 20-3, at 2-9 (brackets in original).

The Supreme Court has made clear that the "deliberate deception of a court and jurors by the presentation of known and false evidence is incompatible with the rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972). It is thus well-settled that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97 (1976) (footnote omitted); see also *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998). To prevail on a claim that a conviction was obtained by evidence that the government knew or should have known to be false, a defendant must show that the statements were actually false, that the statements were material, and that the prosecutor knew that the statements were false. *Coe*, 161 F.3d at 343. A habeas petitioner bears the burden of proving that the disputed testimony constituted perjury. *Napue*, 360 U.S. at 270.

The trial court implicitly found that Holman's recanting affidavit was not credible. Dkt. 20-3, at 8. As indicated above, a federal district court must presume the correctness of state court factual determinations, and a habeas petitioner may rebut this presumption only with clear and convincing evidence.

*Bailey v. Mitchell*, 271 F. 3d 652, 656 (6th Cir. 2001); § 2254(e)(1). A state court's factual determination that a prosecution witness' recantation and supporting affidavit is not credible is entitled to the presumption of correctness in a federal habeas proceeding. See *Richardson v. Lord*, 7 F. App'x. 1, 2 (2nd Cir. 2001); See also *Poe v. Rapelje*, 5:12-CV-11390, 2014 U.S. Dist. LEXIS 132443, 2014 WL 4715460, * 2 (E.D. Mich. Sept. 22, 2014).

Petitioner does not offer clear and convincing evidence that Holman's affidavit is credible. The affidavit warrants the extreme suspicion typically afforded recanting affidavits and witnesses by the courts. *Byrd v. Collins*, 209 F.3d 486, 508 n.16 (6th Cir. 2000). See also *Welsh v. Lafler*, No. 10-1467, 444 F. App'x 844, 850 (6th Cir. 2011) (trial witness's sworn recantation must be viewed with caution); *Bower v. Curtis*, No. 03-1821, 118 F. App'x 901, 908 (6th Cir. Dec. 17, 2004) ("The recanting of trial testimony by prosecution witnesses is typically viewed with the 'utmost suspicion.'") (internal quotation omitted). The affidavit contradicts Holman's sworn trial testimony. It was executed in 2012, approximately four years after Petitioner's 2008 trial. Holman offers no reason for his recantation other than a generalized desire to clear his conscious.   And as discussed above, defense counsel admitted at trial the letter Holman wrote to the prosecutor initiating contact, thus

contradicting his new claim that the prosecution contacted him and fed him information about Petitioner's case so he could concoct a confession.

As described in the trial court's opinion, Petitioner admitted at trial that he was a "big mouth" in jail, and that Holman and Whittie were in jail with him. Dkt. 11-1, at 32-33. He also testified at trial that he thought Holman and Whittie obtained information about the crime by reading newspaper articles. Id. This contradicts Holman's claim in his affidavit that "at no time did Ted Gipson confess any crimes to me. All information I testified to was information I received from reading the case file of Ted Gipson provided to me. . . ." Dkt. 17, Exhibit B, ¶ 14. The trial court's decision that Gipson's affidavit was not credible has not been rebutted by clear and convincing evidence. The claim fails because Petitioner has failed to establish that perjured testimony was presented at trial.

Additionally, and for the reasons detailed in the trial court's lengthy discussion, the alleged perjured testimony by Holman and Whittie was not significantly different than what Petitioner admitted to at trial. Neither man testified that Petitioner admitted to being a significantly more active participant in the beating of the victim than Petitioner himself testified to at trial. Their recollection of Petitioner's statements referred to "put[ting] boots to him,"

"kicking," and "punching" in general. Petitioner admitted at trial that he punched the victim in the face and kicked him when he was on the ground. Dkt. 11-1, at 15-17. Petitioner minimized his conduct by stating that he stopped striking the victim while his brother continued to beat him. Id. Holman and Whittie's trial accounts did not dispute this testimony and were not substantially more damaging than Petitioner's own account.

Therefore, discounting Holman and Whittie's testimony, it was reasonable for the state court to reject the claim because Petitioner did not demonstrate a reasonable likelihood that the false testimony affected the judgment of the jury. That is, it was reasonable to deny relief with respect to the claim first by reasonably rejected as false the contents of Holman's affidavit, and then second by reasonably finding that even if the testimony was false, Holman and Whittie did not add significant weight to the prosecutor's case.

Because none of Petitioner's claims merit relief, the petition will be denied.

### IV. Certificate of Appealability

Before Petitioner may appeal this Court's dispositive decision, "a circuit justice or judge" must issue a certificate of appealability. See 28 U.S.C. §

2253(c)(1)(A); Fed. R.App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).To satisfy § 2253(c)(2), Petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted). The Court finds that reasonable jurists would not debate the resolution of his claims. The Court will therefore deny a certificate of appealability with respect all of Petitioner's claims.

If Petitioner chooses to appeal the Court's decision, however, he may proceed in forma pauperis because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V. Conclusion

Accordingly, the Court 1) **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus, 2) **DENIES** a certificate of appealability, and 3) **GRANTS** permission to appeal in forma pauperis.

**SO ORDERED.**

S/Denise Page Hood
Denise Page Hood
Chief Judge, United States District Court

Dated: February 7, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 7, 2018, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager